**Electronically Filed
Intermediate Court of Appeals
CAAP-13-0003839
30-SEP-2016
08:17 AM**

NO. CAAP-13-0003839

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

STATE OF HAWAI'I, Plaintiff-Appellee, v.
JOHN CHRISTOPHER JENKINS, Defendant-Appellant

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 13-1-0366)

MEMORANDUM OPINION
(By: Fujise, Presiding Judge, Leonard and Reifurth, JJ.)

I.

Defendant-Appellant John Christopher Jenkins (Jenkins) appeals from the Judgment of Conviction and Sentence for Cruelty to Animals in the Second Degree in violation of Hawaii Revised Statutes (HRS) § 711-1109(1)(b) (2014), entered by the Circuit Court of the First Circuit (Circuit Court)[1] on August 9, 2013.

On appeal, Jenkins argues that (1) the Circuit Court erred in its instructions to the jury when it (a) failed to include all statutory examples of "necessary sustenance"; (b) failed to instruct the jury, *sua sponte*, on the "choice of evils" defense; and (c) instructed the jury to disregard the attorneys' arguments on the law during closing arguments; (2) the deputy prosecutor committed prosecutorial misconduct by misstating the law in closing argument; (3) the Circuit Court erred when it denied his motion for judgment of acquittal at the end of the State's case; (4) the Circuit Court abused its discretion when it sentenced Jenkins to a term of imprisonment based on facts not

_____

[1] The Honorable Patrick W. Border presided.

established in the record; and (5) he was deprived of his right to effective assistance of counsel.

## II.

On March 13, 2013, the State of Hawai'i (State) charged Jenkins by Complaint with Cruelty to Animals in the Second Degree, in violation of HRS § 711-1109(1)(b). Jury trial commenced on August 6, 2013.

Jenkins testified that he was the owner of a Pomeranian/Chihuahua mixed-breed dog (dog). One night at the end of April 2012, he was upstairs at home, doing laundry. His brother, Robert, was downstairs playing guitar with a friend when Jenkins heard a yelp. Jenkins went downstairs and discovered that Robert's friend, who weighed 320 pounds, had stepped on the dog's leg, snapping the leg in half.

Jenkins fashioned a splint using two popsicle sticks and gauze and administered "Aleve" to the dog for pain relief. Jenkins testified that the next day, the dog "seemed fine" and about two days after the break, he took off the gauze and re-wrapped it. Jenkins changed the popsicle sticks and did not notice any bones, flesh wounds, or discoloration.

A few days after re-wrapping the dog's leg, Jenkins noticed that it "was just flopping, flopping around" and the dog was "whimpering in pain." Jenkins decided to snip the paw off with a pair of scissors, "to alleviate the pain and suffering." He ran the scissors under hot water because "that's just a normal common sense to sterilize a – a mechanism." After Jenkins snipped off the paw, the dog acted fine and stopped whimpering. Jenkins soaked the remaining part of the dog's leg in Hawaiian salt, applied antiseptic, and regauzed it.

After removing the dog's paw, Jenkins called around to several veterinarians and "got some different quotes." One quote was for $1200 because the paw "was already off." Later that night, Jenkins's tenant, Billie Jean Silva (Silva), suggested that she take control of the dog because she knew of a pet hospital in Kahala. Jenkins gave Silva some money for gas and for the veterinary bill.

2

Silva testified that, in late April 2012, she was living with her boyfriend, Muchuro Higa (Higa), as a tenant in the "front house" on Jenkins's property. Silva testified that either the day or the day after she moved in, she and Jenkins were talking about dogs and at some point Jenkins stated, "Well, you should see my other dog" and tossed Silva a foot. Silva testified that Jenkins told her that he had chopped his dog's leg off. Silva testified that the dog foot was warm.

One or two days later, Silva saw Jenkins's dog in the yard with one leg missing and without any bandages. She then approached Jenkins and asked if she could take his dog to a veterinarian. She took the dog to a vet in Kahala, who gave her a number for Jenkins to call in order to pick up his dog in a few days.

Higa testified that he first saw Jenkins's dog when it was going to the bathroom in the yard and limping around. The dog did not have its leg bandaged and the bone was showing. He and Silva took it to the veterinarian because its leg was chopped off. Silva "freaked out" after Jenkins threw a chopped-off dog paw at her.

Higa testified that he saw, from a couple feet away, Jenkins throw the paw to Silva, and that he never saw Jenkins bandage the dog, give it pain medicine, or apply antiseptic to the dog. Higa admitted that he did not include the paw-throwing incident in his statements to the Honolulu Police Department (HPD) or the Hawaiian Humane Society (HHS). Higa testified that, in his HHS report, he wrote that he did not think Jenkins's removal of the dog's paw was done to be mean.

Kevin Martin (Martin) worked as an investigator for HHS from "[a]bout March 2007 until about September" of 2012, and his responsibilities included animal cruelty investigations. Martin testified that on May 8, 2012, he went to the Kahala veterinary clinic with Keoni Vaughn (Vaughn), the director of operations for HHS. They met Jenkins, who stated that (1) Jenkins's brother's friend had stepped on the dog; (2) Jenkins had splinted the dog's foot; (3) approximately four days later, he noticed the dog had

chewed through the bandage and at that point the paw was hanging by a few ligaments; and (4) Jenkins snipped the foot off.

On May 10, 2012, Martin interviewed Jenkins who was cooperative. Jenkins told Martin that the dog's leg was broken on April 28, 2012. Jenkins had attempted to make a homemade cast for the dog's leg using popsicle sticks and gauze, that the dog had chewed through the homemade splint, that he had attempted to rebandage it, that he had soaked the foot, and that he had administered Tylenol or Advil to the dog. Jenkins also told Martin that he knew the leg would not be able to be reattached and so he snipped it off with scissors.

Martin testified that he also interviewed Silva and Higa and Silva told him that, when she saw the dog running around outside, he did not appear to be in pain.

Dr. Erik Pegg (Dr. Pegg) testified that on or about May 8, 2012, he treated the dog on an emergency basis for a missing right front forearm. The dog exhibited visible signs of pain because he did not like to be touched on the injured arm. Upon Dr. Pegg's examination, the dog

> was missing the . . . distal portion of the forearm.
> Basically about halfway from the radius and ulna down there
> was exposed bone, both the radius and ulna . . . The flesh,
> skin, and muscles and tendons and so forth that normally
> cover the bone were retracted up towards . . . the elbow.
> And there was pus present around the wound. [2]

Dr. Pegg testified that the amputation was not performed correctly because

> the dog would have been anesthetized . . . and given post-op
> pain medication. The area would have been clipped and
> surgically prepped to maintain a sterile environment.
> Sterile instruments would have been used to prevent
> infection. . . . [T]he end of . . . the leg would have been
> closed and sutured over again to prevent an open wound.

In Dr. Pegg's opinion, leaving such a wound open is inviting infection.

---

[2] The dog also required further amputation above the exposed end of the leg "to . . . get rid of the infection that had already set in." In Dr. Pegg's opinion, the dog's pain would not have subsided at that point because

> he had exposed bone. Now, granted some of the nerve endings
> were probably desiccated, drying out and dying, but the
> tissue that had contracted up the bone that -- when I
> palpated was definitely sore. And he had infection that was
> setting in as well, and that's painful as well.

Dr. Pegg explained that when a dog chews away bandage applied to an injury, the risk of infection and pain associated with the injury increases. Dr. Pegg testified that "a very common reason" a dog is chewing at his foot is because it is painful.

Dr. Pegg testified that using popsicle sticks and gauze to create a splint is not proper veterinary care and was at best first aid stabilization en route to a veterinary facility. Dr. Pegg opined any bone break or fracture is a medical emergency and the dog's initial break would likely have been amenable to repair had it been splinted correctly. However, Dr. Pegg could not be certain to a reasonable veterinarian medicine probability what caused the dog's foreleg to be separated.

Doctor Aleisha Swartz (Dr. Swartz) was the chief veterinarian at HHS and assisted in the amputation surgery on the dog. Upon her inspection of the dog prior to surgery, she noted that there was hair embedded in the wound, the wound looked old and dirty, the dog appeared to be in pain, and the wound appeared to be infected due to the presence of pus or purulent discharge.[3]

Dr. Swartz testified an animal would be in constant pain after a grievous break, that bone pain is one of the most severe types of pain, and that attempting to handle the wound without pain medication would be "excruciatingly painful."

Dr. Swartz testified using popsicle sticks and gauze to create a splint is not proper veterinary care, and the items used by Jenkins were "completely inappropriate for work on any tissue." In her experience, it was uncommon for a small dog with a front leg fracture to need to have the leg amputated.

Dr. Swartz testified HHS would not turn someone away that had an animal with an injury like Jenkins's dog. HHS accepts animals for treatment from owners who cannot afford private veterinary care "24 hours a day, every day of the year[,]" but that the person must surrender ownership of the animal because HHS is not a public veterinary clinic for owned pets. Pet owners who do not want to surrender their animal to

---

[3]     Pictures of the dog's injured leg and severed foreleg were admitted into evidence at trial.

HHS would be told they must immediately take the animal to a veterinarian and if necessary, they would be escorted to one, because "non-treatment is not an option. The dog is in a lot of pain."

On August 8, 2013, the jury found Jenkins guilty as charged. The following day, the Circuit Court sentenced Jenkins to probation for one year, to imprisonment for sixty days, and assessed a $55 Crime Victim Compensation Fee and a $70 Probation Service Fee. The Circuit Court stayed mittimus pending Jenkins's appeal.

## III.

## A.

*THE CIRCUIT COURT'S INSTRUCTIONS WERE NOT ERRONEOUS.*

1. *The Circuit Court's Instruction on Cruelty to Animals in the Second Degree Was Not Prejudicially Insufficient or Misleading.*

Jenkins argues that the Circuit Court erred when its jury instruction on Cruelty to Animals in the Second Degree[4] failed to include all statutory examples of "necessary sustenance."[5] "When jury instructions or the omission thereof

---

[4]    Jenkins was charged under HRS § 711-1109(1)(b) which provides,

**Cruelty to animals in the second degree.** (1) A person commits the offense of cruelty to animals in the second degree if the person intentionally, knowingly or recklessly:

. . . .

   (b) Deprives a pet animal of necessary sustenance or causes such deprivation[.]

[5]    **HRS § 711-1100. Definitions.**

"Necessary sustenance" means care sufficient to preserve the health and well-being of a pet animal, except for emergencies or circumstances beyond the reasonable control of the owner or caretaker of the pet animal, and includes but is not limited to the following requirements:

   (1) Food of sufficient quantity and quality to allow for normal growth or maintenance of body weight;

   (2) Open or adequate access to water in sufficient quantity and quality to satisfy the animal's needs;

   (3) Access to protection from wind, rain, or sun;

(continued...)

6

are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading." State v. Gonsalves, 108 Hawai'i 289, 292, 119 P.3d 597, 600 (2005) (internal quotation marks omitted) overruled on other grounds by State v. Auld, 136 Hawai'i 244, 361 P.3d 471 (2015).

The Circuit Court's jury instruction on necessary sustenance read,

> Necessary sustenance means care sufficient to preserve the health and well-being of a pet animal except for emergencies or circumstances beyond the reasonable control of the owner or the caretaker of the pet animal and includes, but is not limited to, the following requirement: Veterinary care when needed to prevent suffering.

---

[5](...continued)

    (4)    An area of confinement that has adequate space necessary for the health of the animal and is kept reasonably clean and free from excess waste or other contaminants that could affect the animal's health; provided that the area of confinement in a primary pet enclosure must:

        (A)    Provide access to shelter;

        (B)    Be constructed of safe materials to protect the pet animal from injury;

        (C)    Enable the pet animal to be clean, dry, and free from excess waste or other contaminants that could affect the pet animal's health;

        (D)    Provide the pet animal with a solid surface or resting platform that is large enough for the pet animal to lie upon in a normal manner, or, in the case of a caged bird a perch that is large enough for the bird to perch upon in a normal manner;

        (E)    Provide sufficient space to allow the pet animal to, at minimum, do the following:

            (i)    Easily stand, sit, lie, turn around, and make all other normal body movements in a comfortable manner for the pet animal, without making physical contact with any other animal in the enclosure; and

            (ii)    Interact safely with other animals within the enclosure; and

    (5)    Veterinary care when needed to prevent suffering.

HRS § 711-1100 (2014).

The veterinary care requirement was added in 2010 in 2010 Haw. Sess. Laws Act 147 § 1 at 341. In so doing, the Legislature stated, "The purpose of this Act is to revise laws prohibiting the cruel treatment of pet animals by specifying the standards of care that an owner must provide a pet animal, including the type of pet enclosure and under what conditions and when veterinary care must be provided." Id. Thus, the statutory definition of necessary sustenance "includes but is not limited to" a list of statutorily defined, distinct standards of animal care, regarding food, water, shelter, hygiene, and medical care. HRS § 711-1100 at n.5, supra. While each is a component of sustenance, each does not help to define the others. The statutory definition of necessary sustenance therefore contains a non-exclusive list of standards, not a factor test.

The State did not charge Jenkins with failing to meet any other standard of necessary sustenance.[6] State v. Lee, 75 Haw. 80, 856 P.2d 1246 (1993), upon which Jenkins relies, is distinguishable. The Supreme Court of Hawai'i, construing the statute defining prohibited drug paraphernalia, held that the trial court erred when it did not provide all the statutorily enumerated factors included in the statute. Lee, 75 Haw. at 115, 856 P.2d at 1264. The supreme court ruled that consideration of the "presence or absence of any of the fourteen specific factors" was relevant toward the "defendant's intent or the lack of it" with regard to the item alleged to be drug paraphernaila Id.

Jenkins also argues that listing only one of the statutorily defined examples of necessary sustenance, but still

---

[6]     The single count of Cruelty to Animals with which Jenkins was charged, read as follows:

> On or about the 29th day of April, 2012, in the City and County of Honolulu, State of Hawaii, JOHN CHRISTOPHER JENKINS did intentionally, knowingly, or recklessly deprive a pet animal of necessary sustenance or caused such deprivation, thereby committing the offense of Cruelty to Animals in the Second Degree, in violation of Section 711-1109( 1 )(b) of the Hawaii Revised Statutes. "Necessary Sustenance" as defined by Section 711-1100 of the Hawaii Revised Statutes, means care sufficient to preserve the health and well-being of a pet animal, except for emergencies or circumstances beyond the reasonable control of the owner or caretaker of the pet animal, and includes veterinary care when needed to prevent suffering.

including the "includes but is not limited to the following requirement" language, "compounded the error by telling the jury that they were free to consider _factors_ other than just 'veterinary care when needed to prevent suffering.' In effect, the broad language allowed the jury to come up with their own standards."

Jenkins cites no authority in support of his assertion. Under the logic proffered by Jenkins, any statutory definition providing the "includes but is not limited to the following requirements" language, authorizes a jury to "come up with their own standards." To the contrary, the instruction conveys, although there may be other standards, the failure to provide veterinary care was the focus of this case. Rather than inviting the jury to invent its own standards, the court directed the jury's attention to one. This instruction was not in error.

> 2. *The Circuit Court Did Not Plainly Err When It*
> *Did Not Provide a Jury Instruction on the*
> *"Choice of Evils" Defense.*

Jenkins argues that the Circuit Court plainly erred when it failed to instruct the jury, *sua sponte*, on the "choice of evils" defense[7] because the Circuit Court was obligated to

---

[7]     HRS § 703-302 (2014)

**Choice of evils.** (1) Conduct which the actor believes to be necessary to avoid an imminent harm or evil to the actor or to another is justifiable provided that:

> (a)   The harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged;

> (b)   Neither the Code nor other law defining the offense provides exceptions or defenses dealing with the specific situation involved; and

> (c)   A legislative purpose to exclude the justification claimed does not otherwise plainly appear.

(2)   When the actor was reckless or negligent in bringing about the situation requiring a choice of harms or evils or in appraising the necessity for the actor's conduct, the justification afforded by this section is unavailable in a prosecution for any offense for which

(continued...)

give instructions on any defense having support in the evidence. Jenkins argues that the evidence supported a "choice of evils" defense because "Jenkins reasonably believed that [the dog] was in so much pain that he had to act immediately by cutting off the paw[.]" Jenkins misconstrues the choice of evils defense.

When a "jury instruction that is not requested at trial, the omission of which is later denominated as error for the first time on appeal," a "two-step, plain-error-then-harmless error review" is used in analyzing instructional error. State v. Taylor, 130 Hawai'i 196, 204, 307 P.3d 1142, 1150 (2013). Under the two-part test, the appellate court must determine (1) whether the defendant has overcome the presumption that the instructions as given were correct and, if so, (2) whether the erroneous instruction contributed to the defendant's conviction, i.e., was not harmless beyond a reasonable doubt. Id.

Jenkins fails to satisfy the first prong. Taking Jenkin's testimony regarding his intent as true, that he cut the dog's paw off to alleviate its pain and suffering. Jenkins does not attempt to explain why his conduct of cutting off the paw to avoid the evil of continued pain and suffering of the animal was necessary to avoid a greater evil sought to be prevented by the law defining the offense charged. In fact, by failing to provide "veterinary care when needed to prevent suffering" he did not avoid a greater evil as he does not deny a veterinarian would relieve the dog's pain, and he arguably caused a greater evil by not addressing the dog's need for painkillers and antibiotics.

In any event the choice of evils defense was not available to Jenkins as a matter of law. HRS § 703-302 requires that the defendant's action "be necessary to avoid an imminent harm or evil to the actor or to another" (emphasis added). When discussing HRS § 703-302 in the context of a defendant who claimed the defense because he prevented greater harm to dolphins, this court held that

> This argument must fail because, as the trial court noted, the legislature has provided a specific definition of

---

[7](...continued)
> recklessness or negligence, as the case may be, suffices to establish culpability.

> "another" that does not include dolphins. HRS § 701-118(8)
> defines "another" as "any other person and includes, where
> relevant, the United States, this State and any of its
> political subdivisions, and any other state and any of its
> political subdivisions." Person is defined as a natural
> person and when relevant a corporation or an unincorporated
> association. HRS § 701-118(7). Thus, the statute makes
> clear that a dolphin is not "another" under HRS
> § 701-118(8).

State v. LeVasseur, 1 Haw. App. 19, 25, 613 P.2d 1328, 1333 (1980). Therefore, as a matter of law, Jenkins cannot assert the choice of evils defense to the extent that Jenkins acted to alleviate the pain and suffering of his dog.

Jenkins attempts to distinguish LeVasseur because the defendant in that case was charged with theft and not cruelty to animals. However, it is clear that the court's reasoning in LeVasseur was not dependent upon the particular charge.

The Circuit Court's failure to give a choice of evils defense instruction was not error.

3. *The Circuit Court Did Not Err When It Instructed the Jury That The Circuit Court Instructions, and Not the Parties' Attorneys, Were the Source of Law.*

Jenkins argues that the Circuit Court erred when it instructed the jury to disregard the attorneys' arguments on the law during closing arguments because that instruction violated Jenkins's right to a fair trial and effective assistance of counsel.

On August 8, 2013, prior to closing arguments, the Circuit Court instructed the jury as follows:

> Ladies and gentlemen, you now have in hand the jury
> instructions, which I read to you. And let me describe for
> you how you may deal with those. They're very valuable to
> you because they are your miniature encyclopedia of the law
> of this case. And about 99 percent of the questions that
> jurors have over the course of their deliberations, when
> they do, relates to something that is written. And so I'm
> not telling you not to send inquiries to me, written
> inquiries, but more often than not, I usually refer you back
> to a page of the instructions that answers the questions
> which -- which you have. So these are very valuable.
>
> . . . .
>
> You are the judges of the facts of this case. You
> will decide the facts -- what facts were proved by the
> evidence. However, you must follow these instructions even
> if you disagree with them.

During Jenkins's closing argument, the following exchange occurred:

> [DEFENSE COUNSEL]: Similarly, there is nowhere in this packet, the rules, the law that says if John splinted an animal wrong, his pet wrong, he is guilty of a crime. That would be veterinary malpractice, and that's not what we're here for. This law is to prevent people from torturing or being cruel to their animals -- from preventing them from eating, from -- for those who don't give them water, don't give them shelter, puppy mills.
>
> [PROSECUTOR]: Objection. Misstatement of the law, Your Honor.
>
> [CIRCUIT COURT]: Well, when it comes to the law, you must read the jury instructions. If the attorneys make -- if the attorneys make statements about the law, that may or may not be true. The law is my domain. The facts are your and their domain. So you should make reference to the jury instructions when you're determining what the law is, and the attorneys' arguments are not dispositive about what the law is.

After closing arguments and prior to jury deliberations, the Circuit Court conducted the following discussion at the bench:

> [CIRCUIT COURT]: Because there are so many references to what the law is, I feel obligated to issue an instruction to the jury that what the law is is not determined by what the attorneys argue. It is determined instead by the instructions that I gave them.
>
> [DEFENSE COUNSEL]: Okay.
>
> [PROSECUTOR]: Thank you, Your Honor.
>
> [DEFENSE COUNSEL]: I object to that instruction.
>
> [CIRCUIT COURT]: I beg your pardon?
>
> [DEFENSE COUNSEL]: I object to that instruction.
>
> [CIRCUIT COURT]: Well, in the future, in the future, remember in this court, if you don't remember it anywhere else, I get to recite the law.

The Circuit Court then instructed the jury:

> Ladies and gentlemen, at this point I want to harken you back to the jury instructions that you have. There have been arguments made to the effect that the law is this, the law is that. The facts and interpretations of the facts are determined by you as a jury and may be argued by the attorneys. The law is what the instructions say the law is. So if you heard an argument from either side that indicates the law says that such and such is required or such and such is not required from the attorneys, you are to disregard that. The law is determined by the Court. It's what I read to you. It's what you have in your jury instructions. Use that as your standard for determining -- determining the law component of your decision.

(Emphasis added.)

Jenkins argues that the underscored sentence "basically instructed the jury to completely disregard counsel's arguments on the law" because "[t]he timing of the instruction basically told the jury to completely disregard all of defense counsel's arguments on the applicable law." Jenkins argues that it "was a blanket prohibition that undercut a significant part of defense counsel's argument."

Jenkins's argument is without merit. It is well settled that "the ultimate responsibility properly to instruct the jury lies with the court." Taylor, 130 Hawai'i at 210, 307 P.3d at 1156. The Circuit Court's admonition correctly apprised the jury that with regard to the law, it should follow the jury instructions rather than the argument of counsel. Further, the court's instruction was not a "blanket prohibition" as it pertained to conflicts between the arguments and jury instructions, not all legal arguments of counsel.

Jenkins further argues that, pursuant to Herring v. New York, 422 U.S. 853 (1975), "[t]he trial court could have given an instruction that the jury should listen to each attorney's arguments as to the law but that the court's instructions were controlling."

> The Constitutional right of a defendant to be heard through counsel necessarily includes his right to have his counsel make a proper argument on the evidence and the applicable law in his favor, however simple, clear, unimpeached, and conclusive the evidence may seem, unless he has waived his right to such argument, or unless the argument is not within the issues in the case, and the trial court has no discretion to deny the accused such right.

Herring, 422 U.S. at 860 (citation omitted).

However, Jenkins's argument misses the significant distinction between argument on the applicable law and a misstatement of that law. A trial court is obligated to take immediate curative action to correct misstatement of law made during closing arguments; indeed, failure to do so when the misstatement is made by the prosecutor results in a new trial. See State v. Basham, 132 Hawai'i 97, 111, 319 P.3d 1105, 1119 (2014) (holding that a "misstatement of the law for which no

curative instruction was given was not harmless beyond a reasonable doubt.").

When viewed in context, it is clear that the Circuit Court's instruction was a proper exercise of its obligation to take immediate curative action to correct a misstatement of law.

Jenkins's third asserted point of error is without merit.

B.

*THE PROSECUTOR DID NOT COMMIT PROSECUTORIAL MISCONDUCT WHEN HE DISCUSSED UNANIMITY DURING CLOSING ARGUMENT.*

Jenkins argues that the State's attorney committed prosecutorial misconduct because he misstated the law on "specific unanimity" during his closing argument.

"Prosecutorial misconduct warrants a new trial or the setting aside of a guilty verdict only where the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial." State v. McGriff, 76 Hawai'i 148, 158, 871 P.2d 782, 792 (1994). "In order to determine whether the alleged prosecutorial misconduct reached the level of reversible error, we consider the nature of the alleged misconduct, the promptness or lack of a curative instruction, and the strength or weakness of the evidence against defendant." State v. Agrabante, 73 Haw. 179, 198, 830 P.2d 492, 502 (1992).

The Circuit Court gave the following jury instruction:

> The law allows the introduction of evidence for the purpose of showing that there is more than one act or omission upon which proof of an element of an offense may be based. In order for the prosecution to prove an element, all 12 jurors must unanimously agree that the same act or the same omission has been proved beyond a reasonable doubt.

During the settling of jury instructions, the following exchange occurred:

> [CIRCUIT COURT]: This unanimity instruction, which is Court's 29, 8.02, is an Arseo [sic] type of instruction. And the State apparently wants to make an objection on this one, so go ahead.
>
> [PROSECUTOR]: That's correct, Your Honor. I'm objecting to the instruction being given altogether. I think it's clear from the evidence that there's really only one omission. And what happened, it was over a course of a continuous conduct in which the defendant omitted -- he did not provide veterinary care. That was the omission. So throughout -- from April 28th, 2012, to May 5th, 2012, was one continuous omission of not providing veterinary care. And that's the basis of the objection.

14

[CIRCUIT COURT]: Okay. And I would note that I'm going to read the instruction over objection by the State but modified so it will read at all points, act or omission, and then, item, in line 2, and, possession of the item, in the final line is eliminated.

This in no way prevents the State from arguing that the act -- well, that the offense was the omission of care. This does not restrict you from arguing that. But because there are acts including the snipping of the last vestige of the arm between the distal portion of the arm and the forearm, which was severed from the -- the dog, it would qualify as an act, as well as the formation of the splint, which would qualify as an act. And there might be other things as well in the testimony.

I'm not prohibiting either side from arguing that the acts or omissions were either okay or that they weren't. In fact, this instruction specifically tells the jury that they all have to agree that the same thing, either an omission or an act, was what brought about the result.

So this instruction will be read over objection by the State to eliminate all references to, item, and it will read, act or omission, in line 2, and it will read the same act or the same omission in the -- those lower lines toward the end. So this is given as modified over objection by the State.

During its closing argument, the State argued the following:

[PROSECUTOR:] Now, defendant failed to [provide necessary sustenance] in this case. And he failed to do that over the entire course of a week.

Now, to illustrate that, I want you all to just take a moment and let's review the events between April 28th, 2012, till May 6th, 2012.

Okay. So what should -- what should defendant have done? Okay. There's a lot -- lot of things he could have done. All right? The most obvious one, take [the dog] to a veterinarian. He did not do that.

. . . .

Okay. So there's some verbiage in there. So let's just start with the first element. Okay. That on or about April 29th, 2012, in the City and County of Honolulu, State of Hawaii, the defendant deprived a pet animal of necessary sustenance or caused such deprivation. Okay. So there's a couple clearly undisputed parts of this. And that's on or about April 29th, 2012. Okay. That's -- I told you it's a range of dates between the bone break and May 6. Hard to pinpoint an exact minute, time where the care -- where he needed to bring the -- the animal to the vet; right? I mean, Aleisha Swartz says it's from the very get-go. So that's why it's on or about that time. But it includes that whole week.

And you don't all have to agree, well, it was this particular minute that it had to be done. All you had to agree upon is that he didn't do it within that time period.

[DEFENSE COUNSEL]: Objection. Misstatement of the law.

[CIRCUIT COURT]:  I'm sorry.  Objection?

[DEFENSE COUNSEL]:  Misstatement of the law.

[CIRCUIT COURT]:  Overruled.  I'm going to allow the attorneys the freedom to argue.

(Emphasis added.)

Jenkins argues that the State misstated the law and that the Circuit Court "placed its imprimatur upon the prosecutor's statements" when it overruled Jenkins's objection. However, the prosecutor's statement was part of his argument explaining the prosecution's theory of the case, that Jenkins had failed to provide veterinary care for the entire charged period, on or about April 29, 2012, through May 8, 2012.  The prosecutor did not argue that unanimity was not required with regard to whether or not Jenkins failed to provide necessary sustenance. His point was that they did not have to agree on a specific moment when the requirement to provide veterinary care matured. Rather, the prosecutor stated that "[a]ll you had to agree upon is that he didn't do <u>it</u> within that time period" (emphasis added).  Consequently, the prosecutor explained that there was a continuing course of conduct during which Jenkins refrained from providing the requisite veterinary care.

As we conclude the prosecutor's argument was not improper, Jenkins's fourth asserted point of error is without merit.

C.

*THE CIRCUIT COURT DID NOT ERR WHEN IT DENIED JENKINS'S MOTION FOR JUDGMENT OF ACQUITTAL.*

Jenkins argues that he was entitled to a judgment of acquittal because there was insufficient evidence to convict him.

> The standard to be applied by the trial court in ruling upon a motion for a judgment of acquittal is whether, upon the evidence viewed in the light most favorable to the prosecution and in full recognition of the province of the trier of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt.  An appellate court employs the same standard of review.

State v. Hicks, 113 Hawai'i 60, 69, 148 P.3d 493, 502 (2006) (citation omitted).  "To deny a motion to acquit there must be sufficient evidence to support a prima facie case."  State v.

Chun, 93 Hawai'i 389, 396, 4 P.3d 523, 530 (App. 2000) (citation omitted). "[T]he test on appeal when reviewing the sufficiency of the evidence is whether, when viewed in the light most favorable to the State, there is substantial evidence to support the conclusion of the trier of fact." Id.

Preliminarily, when a defendant introduces "evidence in his own behalf after a motion for judgment of acquittal is made at the end of the state's case-in-chief and is denied and fails to renew the motion after the presentation of all evidence, he has waived review of the motion." State v. Elliston, 118 Hawai'i 319, 188 P.3d 833, No. 28543 2008 WL 2781017 at *1 (App. Jul. 18, 2008) (SDO); State v. Halemanu, 3 Haw. App. 300, 303, 650 P.2d 587, 591 (1982). After the Circuit Court denied his motion for judgment of acquittal following the State's case-in-chief, Jenkins introduced evidence. Therefore any allegation of error is deemed waived on appeal.

Regardless,

> where the defendant had previously moved for judgment of acquittal at the end of the government's case and presented evidence on his or her behalf but failed to renew the motion at the close of all the evidence, the grounds raised in the motion may still be considered on appeal to avoid manifest injustice or plain error.

State v. Chen, 77 Hawai'i 329, 333, 884 P.2d 392, 396 (App. 1994).

On appeal, Jenkins reiterates his own view of the evidence in an attempt to relitigate the case. Jenkins does not deny that his dog suffered a broken leg or that he failed to obtain veterinary care for his dog. Rather, he appears to claim that there was no evidence that he was aware he should have obtained that care to avoid his dog's suffering. This contention is not supported by the record.

Jenkins obliquely acknowledges that his conviction could be based on proof of a reckless state of mind. "A person acts recklessly with respect to his conduct when he consciously disregards a substantial and unjustifiable risk that the person's conduct is of the specified nature"; "acts recklessly with regard to attendant circumstances when he consciously disregards a substantial and unjustifiable risk that such circumstances

17

exist," and "acts recklessly with respect to a result of his conduct when he consciously disregards a substantial and unjustifiable risk that his conduct will cause such a result." HRS § 702-206(3) (2014). A risk is substantial and unjustifiable "if, considering the nature and purpose of the person's conduct and the circumstances known to him, the disregard of the risk involves a gross deviation from the standard of conduct that a law-abiding person would observe in the same situation." HRS § 702-206(3)(d). The definition of a reckless state of mind does not require Jenkins's actual knowledge of his dog's pain.

Nevertheless, Jenkins testified that on the day he cut off the dog's lower leg, which was days after it was broken but still within the charged period, the dog was "whimpering in pain."

There was also substantial evidence that under the circumstances, the dog was suffering pain from its injury. Expert witnesses, veterinarians Drs. Pegg and Swartz, testified that the dog would have been in obvious pain at the time its leg was broken, due to the visible desiccation of the tissue surrounding the break, and as a result of the bacterial infection obvious from the liquid discharge from the site of the injury.

Therefore, there was substantial evidence to support the jury's verdict.

D.

*THE CIRCUIT COURT ERRED WHEN IT SENTENCED
JENKINS IN RELIANCE UPON UNPROVEN FACTS.*

Jenkins argues that the Circuit Court abused its discretion when it sentenced Jenkins to a term of imprisonment because at sentencing it improperly made findings and conclusions from the evidence.

Generally, "[t]he authority of a trial court to select and determine the severity of a penalty is normally undisturbed on review in the absence of an apparent abuse of discretion or unless applicable statutory or constitutional commands have not been observed." State v. Reis, 115 Hawai'i 79, 83, 165 P.3d 980, 984 (2007) (citation and internal quotation marks omitted).

However, in sentencing, a trial court must rely solely upon facts for which there is evidence. See State v. Stangel, No. CAAP-13-0003941, 2015 WL 836928 at *13 (App. Feb. 26, 2015) (MOP) (vacating defendant's sentence where the trial court relied upon speculation not supported by evidence in the record); see also State v. Vellina, 106 Hawai'i 441, 450, 106 P.3d 364, 373 (2005) (vacating consecutive sentence based on "unsubstantiated allegation").

The Circuit Court stated that it found Jenkins's description of the amputation to be incredible and disbelieved Jenkins's testimony that he snipped off the lower portion of the dog's leg. Rather, the Circuit Court apparently was under the impression that the dog's leg bone was cut by Jenkins and that such a procedure was unlikely, using a paper scissors. However, throughout the entirety of the trial neither party adduced evidence that Jenkins used anything other than the paper scissors to separate the dog's leg and Jenkins did not testify that he severed the dog's bone. Conversely, it was uncontested that the dog's leg was broken when it was stepped on by Jenkins's brother's friend.

The Circuit Court also appeared to impute a similar finding to the jury. However, the jury was not asked to determine how the dog's leg came to be severed, either by the instructions or by special interrogatories and the jury's communications did not indicate it considered this issue.

It is clear that the Circuit Court considered its unsupported belief, virtually to the exclusion of any other factors, when sentencing Jenkins. As the Circuit Court considered a fact for which no evidence was presented in imposing sentence, the sentence cannot stand.

E.

*JENKINS WAS NOT DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL.*

Jenkins argues that he was deprived of his right to effective assistance of counsel at trial.

"[Q]uestions of constitutional law [are reviewed] under the right/wrong standard." State v. Pratt, 127 Hawai'i 206, 212, 277 P.3d 300, 306 (2012) (citation and internal quotation marks

omitted). Every criminal defendant has the constitutional right to the effective assistance of counsel at trial. See U.S. Const. amend. VI and XIV; Haw. Const. art I, § 14.

> "In any claim of ineffective assistance of trial counsel, the burden is upon the defendant to demonstrate that, in light of all the circumstances, counsel's performance was not objectively reasonable-i.e., within the range of competence demanded of attorneys in criminal cases." Briones v. State, 74 Haw. 442, 462, 848 P.2d 966, 976 (1993) (citation and quotation marks omitted). To meet that burden, the defendant must demonstrate: "1) that there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence; and 2) that such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense." Domingo v. State, 76 Hawai'i 237, 241, 873 P.2d 775, 779 (1994) (citation and quotation marks omitted).

State v. Reed, 77 Hawai'i 72, 83, 881 P.2d 1218, 1229 (1994) overruled on other grounds by State v. Balanza, 93 Hawai'i 279, 1 P.3d 281 (2000).

Jenkins alleges three specific errors or omissions: (1) "defense counsel failed to request a jury instruction on the defense of 'choice of evils[;]'" (2) "defense counsel failed to renew the motion for judgment of acquittal after the defense finished presenting its evidence[;]" and (3) "competent defense counsel would have called [his] brother to back him up."

As previously discussed, Jenkins was not entitled to the "choice of evils" defense.

Jenkins asserts that defense counsel lacked skill, judgment, or diligence when she failed to renew Jenkins's motion for judgment of acquittal after the close of all evidence because Jenkins must now argue that point under a stricter plain error standard. However, as previously discussed, there was substantial evidence that Jenkins deprived his dog of necessary sustenance and so under any standard at trial or on review, Jenkins's renewed motion for judgment of acquittal would have failed.

Finally, Jenkins asserts that his brother's testimony would have corroborated his version of events. However, "[i]neffective assistance of counsel claims based on the failure to obtain witnesses must be supported by affidavits or sworn statements describing the testimony of the proffered witnesses." State v. Richie, 88 Hawai'i 19, 39, 960 P.2d 1227, 1247 (1998).

20

Jenkins's speculation as to his brother's testimony is insufficient to support his ineffective assistance of counsel claim. In similar circumstances, the Supreme Court of Hawai'i explained

> Furthermore, it is not at all certain that the witnesses that trial counsel failed to obtain would have provided the testimony asserted. In State v. Reed, 77 Hawai'i 72, 881 P.2d 1218 (1994), we rejected an ineffective assistance of counsel claim because, other than the defendant's uncorroborated assertions, there was no evidence in the record indicating what the proffered witnesses would have testified to. We held: In the absence of sworn statements from the witnesses verifying that, had they been called, they would have testified as defendant claims they would, defendant's characterization of their potential testimony amounts to nothing more than speculation and, therefore, is insufficient to meet his burden of proving that his trial counsel's failure to subpoena the witnesses constituted constitutionally ineffective assistance of counsel.

State v. Fukusaku, 85 Hawai'i 462, 481, 946 P.2d 32, 51 (1997) (citations, ellipses, and brackets omitted; formatting altered). The Fukusaku Court concluded that if there was no reliable indication that the proffered testimony would have been helpful, "there can be no error in failing to obtain that testimony." Id.

Similarly, there is no reliable indication of Jenkins's brother's testimony. Jenkins's brother made no sworn statements prior to trial. This court cannot presume to know the substance of his putative testimony.

Jenkins has failed to carry his burden of showing his trial counsel's assistance was ineffective.

IV.

Based upon the foregoing, we vacate the August 9, 2013 sentence entered by the Circuit Court of the First Circuit and remand for resentencing.

DATED: Honolulu, Hawai'i, September 30, 2016.

On the briefs:

Dwight C.H. Lum,
for Defendant-Appellant.

Donn Fudo,
Deputy Prosecuting Attorney,
City & County of Honolulu,
for Plaintiff-Appellee.

Presiding Judge

Associate Judge

Associate Judge

21